UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

### CIVIL NO.: <u>1:24-cv-20016</u>

MICHAEL ANTHONY CERNAK,

     *Plaintiff*,

vs.

UNITED STATES OF AMERICA,

     *Defendant.*

_____

### <u>PLAINTIFF MICHAEL CERNAK'S COMPLAINT</u>

Plaintiff, MICHAEL ANTHONY CERNAK ("PLAINTIFF") by and through his counsel, Levitt & Kaizer and William M. Norris, PA, hereby alleges as follows:

### <u>INTRODUCTION</u>

1. This is a Federal Tort Claim Act ("FTCA") action brought on behalf of MICHAEL ANTHONY CERNAK ("PLAINTIFF") who, while an inmate at FCI Miami, was sexually abused, including raped, by FCI Miami Assistant Food Services Administrator Jack Jackson over a period of 12 months. Jackson groomed and preyed upon PLAINTIFF, a particularly vulnerable person with a history of emotional and physical trauma, through a calculated "carrot and stick" strategy, alternately gifting PLAINTIFF necessities and other things of value hard to come by in prison and threatening to withhold his largesse and harm PLAINTIFF if PLAINTIFF was not compliant.

2. The abuse proceeded in increments, starting with casual touching, and then moving on to "mild" sexual contact and then intimate contact, including oral sex. Then, on June 27, 2011, Jackson summoned plaintiff to his office, ordered two guards who were present to leave, took

1

PLAINTIFF into a supply room, threw him against a wall, told PLAINTIFFF "I'm gonna get that boy pussy, you are not going to play hard to get with me," and repeatedly raped him.

3. PLAINTIFF reported the assault to authorities and the FBI commenced an investigation, substantiating that Jackson had, for years, been sexually abusing inmates, including PLAINTIFF.

4. For his assault upon PLAINTIFF, Jackson, who was HIV positive, was indicted, convicted, and imprisoned. The FBI investigation that culminated in Jackson's indictment confirmed through numerous interviews that Jackson, during a ten-year period, had been engaging in sexual contact with several inmates – referred to by FCI Miami staff as "Jackson's Butt Boys" – and that this conduct was known to staff and supervisory personnel within FCI Miami.

5. Jackson's abuse of PLAINTIFF and PLAINTIFF's resulting damages were, therefore, directly, and proximately caused by the negligence of FCI Miami staff and management, all of whom were employed by DEFENDANT United States of America.

6. As a direct and proximate result of DEFENDANT's negligence, PLAINTIFF has suffered grievously. Obtaining for him fair compensation is the purpose of this lawsuit.

## I. JURISDICTION AND VENUE

7. This action arises under the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*. and the United States Constitution.

8. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

9. Title 28 U.S. Code § 1346(b) (United States as defendant) provides:

(b)(1) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the

2

Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

10. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b) and properly lies in the Miami Division of the United States District Court for the Southern District of Florida, as all acts giving rise to this action occurred in Miami Dade County, Florida.

11. PLAINTIFF has complied with the requirements of 28 U.S.C. § 2675 by presenting Administrative Claims against the United States of America within the two-year window, in 2012 (Admin Tort Claim No. T-SER-2012-05967). PLAINTIFF's Administrative Claim has remained pending for more than six months. The Government has not denied the claim nor has there been a final disposition thereof.

12. 28 U.S.C. § 2675(a) provides:

An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section. The provisions of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim.

## II. THE PARTIES

13. PLAINTIFF, **MICHAEL ANTHONY CERNAK** ("PLAINTIFF") is over the age of 18 and a citizen of the United States and the State of Texas. Between November 10, 2003, and January 23, 2023, PLAINTIFF was a federal prisoner under the care and custody of the United States Department of Justice, Federal Bureau of Prisons ("BOP"). At various times pertinent to

3

this action, PLAINTIFF was housed at Federal Correctional Institution Miami ("FCI Miami") in Miami-Dade County, within the Southern District of Florida.

14. DEFENDANT, **UNITED STATES OF AMERICA** through the United States Department of Justice, Bureau of Prisons ("BOP") at all relevant times operated FCI Miami and employed Jack Chris Jackson ("Jackson") as an Assistant Food Services Administrator.

15. DEFENDANT United States is sued under the Federal Tort Claims Act for the wrongful and tortious acts of its employees and agencies.

### III. NATURE OF ACTION AND RELIEF SOUGHT

16. Beginning in June 2010, PLAINTIFF was sexually abused by FCI Miami Assistant Food Services Administrator Jack Jackson. Jackson repeatedly abused his position and control over inmates in order to physically abuse, sexually assault, and rape inmates, including PLAINTIFF. The physical and sexual abuse perpetrated by Jackson against PLAINTIFF steadily worsened, and in June 2011, Jackson repeatedly sexually abused and raped PLAINTIFF within the confines of FCI Miami.

17. PLAINTIFF brings this action against DEFENDANT UNITED STATES OF AMERICA, which through its U.S. Department of Justice, operates the Federal Bureau of Prisons and FCI Miami.

18. Specifically, the BOP operates, maintains, and provides security at its federal correctional institution known as FCI-Miami, located at 15801 SW 137th Avenue Miami, Florida 33177.

19. PLAINTIFF brings this action to recover for the negligent, hiring, retention, training and supervision of DEFENDANT's employees in allowing another employee, Jackson, to sexually abuse PLAINTIFF, a federal prisoner who pursuant to 18 U.S.C. § 2243, was a ward

4

incapable of consent.

20.     During the relevant period, the executive staff, management staff, and coworkers were alerted to Jackson's sexual abuse of certain federal inmates housed at FCI Miami. Each time an inmate and/or prison staff made reports to the executive staff and prison investigators of Jackson's sexual abuse of inmates, staff and investigators would ignore the allegations or "circle the wagons" to protect Jackson from being disciplined, sanctioned, or removed from FCI Miami. On other occasions, staff at FCI Miami witnessed Jackson's abusive conduct, including against PLAINTIFF, and did nothing to stop that abuse and protect PLAINTIFF from further abuse.

21.     As a direct result of the wrongful acts of the BOP and its employees/staff, Jackson was permitted to continue to engage in grievous abuse of inmates, including PLAINTIFF.

22.     Defendant had a duty to exercise reasonable care to investigate Jackson's sexual abuse and predatory acts against federal inmates and prevent Jackson from sexually abusing inmates, including PLAINTIFF. Instead, DEFENDANT's staff and employees permitted, by turning a blind eye to, Jackson's repeated abuse of inmates in violation of clearly established duties, policies, procedures, and law.

23.     As a proximate and direct result of DEFENDANT's employees' failure or refusal to stop Jackson from the sexual abuse of inmates, PLAINTIFF was physically injured and grievously harmed.

24.     PLAINTIFF seeks compensatory damages in an amount to be determined at trial.

25.     In accordance with applicable law, PLAINTIFF seeks the costs of bringing this action.

## IV. GENERAL ALLEGATIONS

26.     All conditions precedent to the filing of the instant federal civil rights action have

been fulfilled, occurred, accrued, or waived as a matter of law.

27. PLAINTIFF timely presented his claim in writing to the Federal Bureau of Prisons. *See*, Federal Bureau of Prisons assigned FTCA # Admin Tort Claim No. T-SER-2012-05967. The instant FTCA action was filed more than six months after the filing of the PLAINTIFF's Federal Bureau of Prisons' written notice of claim.

28. At all times relevant to this federal civil rights action, Jackson was employed by the Federal Bureau of Prisons at FCI Miami, among other facilities.

29. During the relevant period, Jackson was employed as the Assistant Food Service Administrator at FCI Miami.

### A. **PLAINTIFF's Custody.**

26. PLAINTIFF was incarcerated under the custody of the BOP since November 10, 2003, having pleaded guilty to bank robberies and possession of a weapon occurring in the District of Nevada between 2001 and 2003, when he was approximately 23 years old.

27. On March 25, 2004, while in pre-trial custody, the presiding judge entered an Order for Determination of Mental Competency to Stand Trial pursuant to 18 U.S.C. § 4241. A psychological evaluation was conducted at the Metropolitan Detention Center, Los Angeles, and the report concluded that PLAINTIFF lacked the capacity to assist defense counsel in a meaningful and rational manner and recommended that PLAINTIFF be committed to a medical center for treatment for competency restoration. *See United States v. Cernak*, 03-cr-534, Doc. 33 at 1 (D. Nev. Nov. 16, 2005) (summarizing competency history as part of stipulation for further assessment). On November 29, 2004, PLAINTIFF was transferred to FMC Butner; on July 13, 2005, FMC Butner staff reported PLAINTIFF's competency was restored, some 20-months after he was first declared incompetent. *Id*. at 2. By November 2005, however, PLAINTIFF's condition

again warranted intervention, and, upon the Government's stipulation, he was subject to yet another competency exam. *Id*. He was deemed competent at a hearing conducted on March 22, 2006. We note that the BOP determined that PLAINITFF suffered from "Mild Mental Retardation." (BOP forensic Eval., 7/15/05, p. 6, *Cernak*, 03-cr-534, Doc. 87-4); *see also* BOP Forensic Eval 1/230/2006, *Cernak*, 03-cr-534, Doc. 87-3, p. 6 ("Mild Mental Retardation to Borderline range of intellectual functioning")).

28.      PLAINTIFF ultimately pleaded guilty to bank robbery and firearm possession on September 18, 2006.

29.      Although PLAINTIFF's Guidelines sentencing range was calculated to be 108-135 months for the robberies (plus seven years for the firearm), he was sentenced to 204 months upon the bank robberies and a consecutive 84 months for possession of a firearm in violation of 18 U.S.C. § 924(c)(1)(A).

30.      In 2008, at FCI Miami, BOP medical staff diagnosed PLAINTIFF with schizoaffective disorder, and he was given a mood stabilizer (Valproic Acid), an antipsychotic (Risperidone), and an antidepressant (Prozac). *See United States v. Cernak*, 03-cr-534, Doc. 172 at 12 (D. Nev) (compassionate release application). Staff at FCI Miami, of course, were aware of PLAINTIFF's mental health conditions, since the BOP had assessed and diagnosed him pretrial, in June 2004 (Doc. 87-3), and also in January 2006 (Doc. 87-2); *see also* Doc. 87 (sentencing memo) at 9-10 (summarizing mental health treatment in pre-trial custody).

31.      On January 11, 2023, pursuant to a motion brought under 18 U.S.C. § 3582(c)(1)(A) — alleging as extraordinary and compelling circumstances Jackson's sexual abuse of PLAINTIFF, PLAINTIFF's rehabilitation (including saving two  prison guards lives during a

riot),[1] and youth at the time of the offense — an amended judgment was issued reducing PLAINTIFF's sentence to time served. *See United States v. Cernak*, 03-cr-534, Doc. 191 (D. Nev. Jan. 11, 2023). PLAINTIFF was released from BOP custody on January 23, 2023, after serving 19 years and 2 months in federal custody.

### B. FCI Miami Assistant Food Service Administrator Jack Jackson was a serial abuser who assaulted inmates for years.

32.     Jackson was hired by the BOP in 1993, beginning his career at FCI Miami. Jackson was a foreman in food services for the first eight years. Eventually, he rose to the position of Assistant Food Service Administrator.

33.     At all times relevant to this action, Jackson was HIV positive. He contracted HIV in or about 1987.

34.     Jackson targeted vulnerable inmates he supervised for sexual abuse. Upon information and belief, upon hiring, Jackson immediately began abusing his position of authority over federal prisoners.

### 1. The BOP was aware Jackson abused inmates.

35.   The Special Investigative Service ("SIS"), which investigates staff misconduct in the BOP, was informed of Jackson's abuse of inmates, at least as early as 1999, and perhaps earlier. The "Details" section of an OIG report dated September 2, 1999, stated:

> Complainant alleges that Subject Jack C. Jackson has made unwanted sexual advances toward him/her. It is also alleged that Jackson is having sex with unidentified inmates at FCI Miami.

36.     The OIG report noted that "on September 16, 1999, USAO/S//Florida declined

---

[1]     During a riot at FCI Victorville, PLAINTIFF escorted two guards out of the riot zone following the explosion of a flash bomb. Although PLAINTIFF was placed in isolation for rioting, one of the guards PLAINTIFF rescued testified at his disciplinary hearing that PLAINTIFF was not rioting and the charges against him were expunged. *See United States v. Cernak*, 03-cr-534, Doc. 181-1 (D. Nev. July 5, 2022).

8

prosecution interest in this matter" based upon "no apparent contraband or favoritism being alleged." OIG closed out its investigation **some 8 years** later, finding the "allegation was not sustained" and the investigation was concluded July 25, 2007.

37.     We do not know whether OIG investigated whether Jackson was "having sex with unidentified inmates" or whether it declined to go forward merely based upon the finding that Jackson was not "trading in contraband or showing favoritism." Based upon this 1999 allegation against Jackson, executive staff at FCI Miami knew or should have known that Jackson was abusing inmates; at the least, it knew it needed to carefully observe his conduct.

38.     BOP employees are required to monitor the activity within the jail via cameras and personal observation. When they observed suspicious activity, they were required to personally investigate to prevent or stop any misconduct that might occur.

39.     Even though staff at FCI Miami were aware of Jackson's reported sexual abuse of inmates in general, *see* 1999 OIG complaint, *supra*, and PLAINTIFF in particular, *see infra*, ¶¶ 98-101 (citing FBI 302s), no one intervened to prevent Jackson from abusing PLAINTIFF.

40.     But this failure was not because staff were unaware of Jackson's misconduct. In fact:

    a.  George Solomon, former Food Service Administrator at FCI Miami was aware that Jackson had a relationship with an inmate and was giving marijuana and alcohol to inmates.

    b.  A female staff member, FNU Fegin, was aware of Jackson's abuse of inmates.

    c.  Correctional Officer ("CO") FNU Tierney, who had written PLAINTIFF up for possessing contraband ham and who placed PLAINTIFF in the Special Housing Unit, was astonished when Jackson engineered PLAINTIFF's quick return to

9

kitchen duties, after PLAINTIFF's placement in SHU.

d. CO Lopez was aware that PLAINTIFF and Jackson had sexual contact. Lopez told PLAINTIFF: "I know what you and Jackson are up to. If you want to have fun together, don't do it when I work because I want to go home."

e. CO Lopez was also aware that Jackson had a relationship with the inmate that introduced PLAINTIFF to Jackson. Lopez was reportedly scared of Jackson and permitted Jackson's "boyfriend" to ransack a storeroom and steal food on one occasion.

f. CO Pongsumbut was aware of Jackson's abuse of PLAINTIFF and once laughed at PLAINTIFF and said: "are you staying late with the boss tonight?"

g. Correctional Officer Richardson was once directed by Jackson to leave PLAINTIFF and Jackson alone and thereafter Richardson nicknamed PLAINTIFF, "don't ask, don't tell." PLAINTIFF was humiliated since Richardson called PLAINTIFF this nickname during the prison count for all inmates to hear. Jackson thereafter warned Richardson to treat PLAINTIFF nice, even when Jackson wasn't around.

h. Correctional Officer King came into the spice room once where PLAINTIFF and Jackson were together with the lights out. The light could only be turned on from the outside. PLAINTIFF's pants were down around his ankles. King saw PLAINTIFF and apologized to Jackson, saying he didn't know they were in there. Jackson said they were leaving. Jackson wanted to finish the act but PLAINTIFF insisted on leaving. King thereafter treated PLAINTIFF well and gave PLAINTIFF anything he wanted in the kitchen.

10

    i.   Officer Rodriguez was aware of Jackson's physical relationship with another inmate and also observed PLAINTIFF eating watermelon in the kitchen, which was obviously a gift from Jackson, since they were sitting together at the time.

    j.   Upon information and belief, other maintenance workers were having sex with Jackson in FCI Miami.

    k.   Upon information and belief, SIS had a stack of reports of abuse committed by Jackson.

41.    PLAINTIFF was aware that Jackson was previously charged with sexual misconduct, but that the charge was resolved in his favor, his accuser was sent to the SHU, and then transferred to a prison far away.

42.    Given both the previous charge against Jackson and the many reports of his sexual contact with other inmates, Jackson should not have been allowed to be in a position to abuse PLAINTIFF. Jackson controlled nearly all aspects of kitchen life in FCI Miami. He decided who worked in the kitchen and what hourly rate (within the prison pay scale) to pay them. He doled out favors including gifts of food, alcohol and other contraband for inmates to consume or sell to other inmates in the prison. Inmates, including PLAINTIFF, feared Jackson and few questioned his authority. At the same time, the benefits Jackson bestowed upon the abused accepted by his victims in the harsh prison environment.

43.    As later documented by the FBI, Jackson's co-workers, supervisors, and executive staff were aware of Jackson's sexual abuse of inmates.

44.    Jackson's supervisors, including but not limited to food service administrator George Solomon, Warden Jorge Pastrana, and Associate Warden Kenneth Atkinson, took no action upon learning of Jackson's sexual abuse of inmates.

11

45. FCI Miami correctional staff, including Correctional Officers Vega, Rodriguez, Lopez, Tierney, and Richardson were aware of Jackson's sexual abuse of inmates.

**2. BOP requires employees to report sexual abuse of inmates.**

46. Executive and correctional staff at FCI Miami did not follow Bureau of Prisons policies designed to protect inmates from such abuse. Instead of disciplining Jackson, executive staff at FCI Miami continued to allow Jackson to work unsupervised with inmates, under circumstances that gave him repeated opportunities to continue his previously mentioned assaultive behavior.

47. FCI Miami Admission and Orientation Handbook provides:

Staff Misconduct: The Standards of Employee Conduct prohibit employees from engaging in, or allowing another person to engage in sexual, indecent, profane or abusive language or gestures, and inappropriate visual surveillance of inmates. Influencing, promising or threatening an inmate's safety, custody, privacy, housing privileges, work detail or program status in exchange for sexual favors is also prohibited.

What is sexually abusive behavior? According to federal law (Prison Rape Elimination Act of 2003) sexually abusive behavior is defined as:

a. Rape: the carnal knowledge, oral sodomy, or sexual assault with an object or sexual fondling of a person FORCIBLY or against that person's will; The carnal knowledge, oral sodomy, or sexual assault with an object or sexual fondling of a person not forcibly or against the person's will, where the victim is incapable of giving consent because of his/her youth or his/her temporary or permanent mental or physical incapacity; or the carnal knowledge, oral sodomy, or sexual assault with an object or sexual fondling of a person achieved through the exploitation of the fear or threat of physical violence or bodily injury. Carnal Knowledge: contact between the penis and vulva or the penis and the anus, including penetration of any sort, however slight. Oral Sodomy: contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus.

b. Sexual Assault with an Object: the use of any hand, finger, object, or other instrument to penetrate, however slightly, the genital or anal opening of the body of another person (NOTE: This does NOT apply to custodial or medical personnel engaged in evidence gathering or legitimate medical treatment, nor the healthcare providers performing body cavity searches in order to maintain security and safety within the prison).

12

c. Sexual Fondling: the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification.

d. Sexual Misconduct (staff only): the use of indecent sexual language, gestures, or sexually oriented visual surveillance for the purpose of sexual gratification.

An incident is considered Staff-on-Inmate Abuse/Assault when any sexually abusive behavior is initiated by a staff member toward one or more inmates. It is also considered Staff-on-Inmate Abuse/Assault if a staff member willingly engages in sexual acts or contacts that are initiated by an inmate, …. **Sexual acts or contacts between an inmate and a staff member, even when no objections are raised by either party, are always forbidden and illegal.**

Federal Correctional Institution Federal Prison Camp Miami, Florida ADMISSION & ORIENTATION, available at https://www.bop.gov/locations/institutions/mim/mim_ao-handbook.pdf?v=1.0.2 (pp. 58-59) (emphasis added)

48. BOP Policy prohibits sexual contact between staff and inmates:

b. Sexual Relationships/Contact With Inmates. Employees may not allow themselves to show partiality toward, or become emotionally, physically, sexually, or financially involved with inmates, former inmates, or persons known (or who should have been known based on circumstances) to the employee as a family member or close friend of inmates or former inmates.

* * *

An employee may not engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates.

BOP Program Statement 3420.11 – Standard of Employee Conduct, 5(b) Personal Conduct, available at, https://www.bop.gov/policy/progstat/3420_011.pdf., (pp. 6-7) (emphasis in original)

49. When BOP staff learns of any "violation, or apparent violation" of the personal conduct standards, they must "immediately report" same to "their Chief Executive Officer (CEO) or another appropriate authority." *Id*. at 2, ¶1(b).

50. BOP Sexually Abusive Behavior Prevention and Intervention Program Statement 5324.12, § 115.17 provides that:

Hiring and promotion decisions. (a) The agency shall not hire or promote anyone who may have contact with inmates, and shall not enlist the services of any contractor, who may have contact with inmates, who: (1) Has engaged in sexual abuse in a prison, jail, lockup, community confinement facility, juvenile facility, or other institution (as defined in 42 U.S.C. 1997).

51.     Bureau of Prisons policy also requires that staff who learn of misconduct report such misconduct to the Bureau of Prisons Office of the Inspector General. BOP Sexually Abusive Behavior Prevention and Intervention Program Statement 5324.12, § 115.61 Staff and agency reporting duties, provides:

(a) **The agency shall require all staff to report immediately and according to agency policy any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility**, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation. **All staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant,** or, where appropriate, in accordance with the Program Statement Standards of Employee Conduct. Staff provide a written follow-up memorandum to the Operations Lieutenant to document such a report, in accordance with Article 6 of the Master Agreement.

*** 

(e**) The facility shall report all allegations of sexual abuse and sexual harassment, including third-party and anonymous reports, to the facility's designated investigators. Staff must report and respond to allegations of sexually abusive behavior, regardless of the source of the report (e.g., "third party").** *Id*. (emphasis added).

52.     When misconduct includes allegations of sexual abuse of inmates by staff, Bureau of Prisons policy also mandates that, upon learning of allegations of sexual abuse, Office of the Inspector General staff must either investigate that misconduct or otherwise ensure that the Bureau of Prisons investigates those allegations. Program Statement 5324.12, § 115.62 (Agency protection duties):

If the alleged perpetrator is a staff member, all options for safeguarding the inmate should be considered as described in the above paragraph. The decisions

14

made to safeguard the inmate should take impact on staff member into account, in accordance with the Master Agreement. Removal from the facility is an extreme measure, and other options include reassignment to another unit or post, or other measures that will effectively separate the staff member from the inmate.

### 3. BOP violated its own rules regarding Jackson's misconduct.

53.     Numerous BOP employees were aware that Jackson was abusing inmates and took no action.

54.     The BOP, through its employees, knew that Jackson abused inmates and therefore violated its own policies by retaining, promoting, and allowing him to continue to abuse inmates.

55.     Staff at FCI Miami violated these policies by not immediately reporting Jackson's known abuse of PLAINTIFF and other inmates. Among other things:

a.  On or about July 15, 2011, BOP, SIS, and FBI agents interviewed an FCI Miami kitchen staff member, who reported – referencing the observations and beliefs of the kitchen staff:

- They observed at least 7 inmates alone with Jackson in his office;
- They observed Jackson giving inmates tuna and cereal;
- They believed Jackson and a [redacted] inmate had a sexual relationship;
- The observed Jackson and PLAINTIFF under "inappropriate situations" coming out of the food warehouse;
- They were aware that Jackson paid PLAINTIFF more than his approved payroll;
- They were aware that other inmates were in Jackson's office with the door closed, which was inappropriate conduct;
- Jackson had several inmate-made paintings in his office;
- They were told that Jackson has sex with several inmates, called "Jackson's Butt Boys;"
- They observed that Jackson utilized sexual hand-gestures in public with PLAINTIFF.

*See also* ¶ 40, *supra*.

56.     FCI Miami failed to adequately investigate and discipline Jackson upon receiving credible reports that he was sexually abusing inmates, and thereby failed to protect PLAINTIFF

15

from Jackson's abuse.

57.     These failures were directly responsible for Jackson being able to assault PLAINTIFF over a period of one-and-one-half years.

58.     Additionally, binding and mandatory Bureau of Prisons policies required that all staff and supervisors at FCI Miami "actively pay[] attention" to indications that inmates were being sexually assaulted or harassed, such as changes in inmate behavior, sleeping and eating habits, and by monitoring "isolated or 'hot' areas of the institution."[2]

59.     When placed on notice of Jackson's misconduct, Jackson's supervisors, including the Food Services Administrator and the Warden did not follow Bureau of Prisons policies designed to protect inmates from such abuse. Instead, they negligently continued to allow Jackson to work at FCI Miami, alone with inmates, under circumstances that gave him repeated opportunities to commit additional sexual assaults, including against PLAINTIFF.

60.     FCI Miami has many security cameras. Staff members watching such cameras knew, or should have known, of Jackson's serial abuse of inmates, including PLAINTIFF.

### C. The Grooming, Sexual Assaults and Rape of PLAINTIFF.

61.     In October 2008, PLAINTIFF was introduced to the kitchen detail at FCI Miami through another inmate who was having a sexual relationship with Assistant Food Services Administrator Jackson.

62.     According to an FBI 302 dated September 7, 2011, in July or August 2008, PLAINTIFF was given a job in the kitchen pursuant to Jackson's request.[3]

---

[2]     *See* Program Statement 5324.12, Sexual Abusive Prevention and Intervention Program, available at, https://www.bop.gov/policy/progstat/5324_012.pdf., (pp.37-38).
[3]     We will make all FBI 302s, BOP competency reports, and other cited materials available to the Court and DEFEDNANT's upon request.

63. Jackson was an intimidating man who wielded power over inmates and prison staff alike.

64. PLAINTIFF was aware that other staff in the kitchen formed relationships with inmates.

65. The kitchen was a sexually charged environment, created largely by Jackson who was always making sexual references. For example, PLAINTIFF observed that if an inmate happened to have a hotdog in his hand, Jackson would say aloud something to the effect of "I know where you could stick that meat" followed by making a grunting noise.

66. Jackson started calling PLAINTIFF "Poppy," instead of by his name.

67. Jackson started inappropriately touching and harassing PLAINTIFF almost immediately by grazing PLAINTIFF's stomach with his finger as he walked by, touching PLAINTIFF's neck, grinding on him from behind and thereby making contact through his clothing between his genitals and PLAINTIFF's backside, grabbing his buttocks, and making obscene comments.

68. At their first meeting, Jackson made clear to PLAINTIFF that he did not like snitches and that he checked out all the inmates who came to work in the kitchen. If other inmates were around, PLAINTIFF tried to join the inmates in laughing off Jackson's inappropriate conduct as a joke, but inside, he was fearful and disgusted.

69. PLAINTIFF felt he had no choice but to tolerate Jackson's flirting and harassment. PLAINTIFF was aware that the last person who reported Jackson's abusive conduct was sent to isolation and then to a prison far away. Additionally, PLAINTIFF liked and needed the kitchen job. PLAINTIFF had a large restitution order to pay, and also needed funds for personal hygiene products, phone calls, stamps, and other necessary items the prison does not provide.

17

70.     Kitchen work was the best paid job in the prison. PLAINTIFF believed Jackson's actions in helping him indebted him to Jackson. And on a personal level, because PLAINTIFF grew up in a dysfunctional household where his parents, caregivers, and foster parents sexually abused and neglected him, he spent his prison time alone, trusting no one, until he met Jackson— someone who helped him financially and showed interest in him despite the sexual harassment that came with it.

71.     In May 2010, when another victim of Jackson's abusive conduct, Jackson's "boyfriend", left the prison, Jackson's harassment of PLAINTIFF turned more aggressive.

72.     In June 2010, Jackson came up from behind PLAINTIFF in the room where spices were kept and forcefully kissed him, jamming his tongue into PLAINTIFF's mouth for 6-7 seconds. PLAINTIFF pulled away.

73.     The next day, as if to placate and reward PLAINTIFF, Jackson gave PLAINTIFF a zip lock bag containing creatine, used for workouts. The next day Jackson gave PLAINTIFF nitrous oxide. Both were contraband. Jackson's assaults escalated. Soon thereafter, Jackson summoned PLAINTIFF into an isolated warehouse and gave PLAINTIFF Nautica underwear, telling him to put them on for him. Jackson then fondled and kissed and performed oral sex on PLAINTIFF. PLAINTIFF put on five pairs of Nautica underwear to smuggle out of the food service area.

74.     PLAINTIFF could not refuse Jackson's order when summoned. PLAINTIFF felt a sense of obligation to go along with the abuse since Jackson was his boss and benefactor. Jackson told PLAINTIFF he had connections. PLAINTIFF was in fear for his life and for his family.

75.     Jackson sexually assaulted PLAINTIFF some four times between June and September 2010, with Jackson forcing PLAINTIFF to perform oral sex on him, Jackson attempting

18

to digitally penetrate PLAINTIFF, and Jackson performing oral sex on PLAINTIFF.

76.     Jackson's abuse of inmates followed his now-familiar pattern: He cornered his victim in his office, kitchen, or warehouse, sometimes giving them gifts of food or clothing and then sexually assaulted them. He also pressured and/or coerced them into silence by threatening them and offering them contraband food and other items.

77.     Jackson gave PLAINTIFF extra food, non-issue undergarments, and other non-approved items, like designer undergarments, alcohol, a lighter, radio, batteries, earplugs, a headset, weight pills and personal hygiene items. Inmates at the FCI were not permitted to possess most of these items. Moreover, pursuant to mandatory Bureau of Prisons policy, including but not limited to Program Statement 3420.11 (Standards of Employee Conduct), the punishment for officers and staff who introduce contraband to FCI Miami ranges from mandatory suspension to removal to prosecution.

78.     PLAINTIFF's possession of extra food and non-issue undergarments was well known among FCI Miami staff and staff were aware that Jackson was preying upon inmates.

79.     Jackson was transferred to FDC Miami in September 2010. Before leaving for his new job, during an oral sexual encounter with Jackson, Jackson attempted to insert his finger in PLAINTIFF's anus.

80.     Jackson's sexual abuse of PLAINTIFF resumed in March 2011, upon Jackson's return to FCI Miami.

81.     In March 2011, Jackson told PLAINTIFF he would write a letter of recommendation to allow PLAINTIFF to enter a painting class and asked PLAINTIFF to follow him to his office. But once there, Jackson kissed and performed oral sex on PLAINTIFF.

82.     On or about June 17, 2011, Jackson took PLAINTIFF into a supply room and began

19

performing oral sex on him. Jackson then turned PLAINTIFF around and placed him on the wall and proceeded to manually stimulate PLAINTIFF until he ejaculated on the wall, at which point Jackson instructed PLAINTIFF to clean it up, which he did with a coffee filter. PLAINTIFF kept telling Jackson he wanted to go, but Jackson laughed at him. PLAINTIFF thought he knew Jackson's outer limits. He was wrong.

83.     On June 27, 2011, Jackson summoned PLAINTIFF again, telling him they needed to go over what needed fixing in the kitchen. Afterward, they went to Jackson's office and another inmate (Vega) and two guards (Lee and King) walked in. PLAINTIFF saw this as his opportunity to leave, but Jackson yelled "No!" Jackson ordered the other guards in the area to leave Jackson and PLAINTIFF alone (*see* FBI 302 dated 7/15/2011). The guards, including CO Richardson, complied. PLAINTIFF was alone with Jackson, abandoned by correctional officers and fearful of the abuse that he knew was imminent.

84.     Jackson then took PLAINTIFF into a supply room where he kissed PLAINTIFF. Jackson forced PLAINTIFF to perform oral sex on him and also performed oral sex on PLAINTIFF. Jackson then threw PLAINTIFF up against the wall and held PLAINTIFF's arm high behind his back. PLAINTIFF tried to break free, but Jackson pulled his arm harder, hurting him, and told him in a "man[ly] voice", that Jackson had never before used, "I'm gonna get that boy pussy, you are not going to play hard to get with me." PLAINTIFF was fearful and crying.

85.     Jackson then forcibly and repeatedly raped PLAINTIFF. PLAINTIFF was bloody from Jackson's forcible rape.

86.     PLAINTIFF had tolerated earlier assaults as necessary to keep himself safe, but the rape crossed a frightening line. PLAINTIFF was terrified he had contracted HIV because of the forced penetration. PLAINTIFF went back to his cell vomited, changed his clothes, and fell into a

zombie-like state. PLAINTIFF believed he could not get help from correctional staff since:

- One guard flat out told him "I know what you and Jackson are up to."
- Another told him to "do it when I'm not working."
- Another guard nicknamed PLAINTIFF "Don't ask don't tell."
- Another guard laughed as he asked PLAINTIFF if he was "staying late with the boss."
- Another guard observed PLAINTIFF with his pants down when Jackson was assaulting him in a small room and did nothing. PLAINTIFF felt humiliated and utterly helpless.
- Finally, CO Richardson delivered him to his abuser.

87.     PLAINTIFF was grievously sexually assaulted. He felt, and continues to feel, humiliated, disgusted, and frightened. For a long time following this attack, PLAINTIFF was fearful he would contract HIV/AIDS.

88.     The attacks brought back memories of PLAINTIFF's childhood when he was neglected, molested, and abused. He felt helpless and powerless to stop the abuse. Following the rape, PLAINTIFF lost 17 pounds in 50 days. PLAINTIFF feared Jackson's reprisals if he informed prison officials.

89.     PLAINTIFF nonetheless immediately reported the rape, wanting to receive medical attention, but, being afraid to identify Jackson as his attacker, initially falsely reported that another – unidentified – inmate raped him. He went to the medical unit, "hoping they could comfort [him], clean [him] in some way or give [him] something to take the AIDS away." PLAINTIFF asked for an HIV test. Staff transported PLAINTIFF to the rape center in Miami where he was swabbed for semen specimens.

90.     The rape center took DNA swabs of the semen collected from PLAINTIFF. PLAINTIFF was given a regimen of HIV inhibitors and was ultimately transferred to another facility. He was also prescribed Buspirone, an anti-anxiety medication, to help deal with the stress and anxiety caused by the sexual assaults and the rape.

21

91.     When PLAINTIFF returned from the rape center, but before being transferred, a fellow inmate advised he was aware of the rape accusation. PLAINTIFF knew that the spread of such false information regarding an inmate-on-inmate sexual assault would make PLAINTIFF a target for inmate abuse.

### D. The Aftermath of the Assaults and FBI Interviews.

92.     Two days after Jackson raped PLAINTIFF, on June 29, 2011, FBI agents questioned PLAINTIFF about the rape, and he acknowledged it was Jackson who raped him. PLAINTIFF gave the FBI details of Jackson's year-and-a-half history of sexual assaults against PLAINTIFF leading up to the rape.

93.     Jackson was also interviewed by the FBI. At first, he lied to the FBI and denied having any inappropriate contact with PLAINTIFF, denied making sexual advances toward PLAINTIFF, and denied providing PLAINTIFF any gifts. Jackson agreed to provide a DNA sample so agents could compare it to the DNA swabs collected from PLAINTIFF at the rape center. Jackson also stated he was HIV positive since 1987. *See* FBI 302 dated July 16, 2011.

94.     The FBI investigation revealed Jackson's DNA profile matched the DNA profile on the semen swabs collected from PLAINTIFF's stomach and left chest. Additionally, the DNA profile from the semen swabs taken on Jackson's office wall matched PLAINTIFF's DNA profile.

95.     PLAINTIFF turned over the two pairs of Nautica underwear and a Hanes T-shirt that Jackson had given him; garments not sold in the prison. Jackson at first denied giving this contraband to PLAINTIFF, but later admitted doing so.

96.     The FBI confirmed through interviews with other guards and inmates that Jackson was engaging in sexual conduct with inmates, confirming that BOP staff had knowledge of Jackson's misconduct.

97.     Another FBI 302 dated August 24, 2011, reports the details of the FBI investigation:

On June, 27, 2011, agents of the Homestead RA, Miami Division were notified of a rape which occurred earlier that day at the (FCI), 15801 SW 137th Ave, Miami, Florida. It is alleged that a Bureau of Prisons (BOP) staff member, Jack Jackson, forcibly raped an FCI inmate [PLAINTIFF]. Investigation has shown that Jackson likely had multiple sexual relationships with inmates at the FCI over a ten-year time frame. It is further alleged that Jackson has been introducing contraband into the FCI in exchange for these sexual relationships.

**Numerous witness interviews corroborate the allegations that Jackson was having sexual relations with inmates**. A DNA test of swabs from a rape kit taken from [PLAINTIFF] placed Jackson's semen on the victim…. (emphasis added).

98.     During his interviews with the FBI, Jackson acknowledged he sexually abused PLAINTIFF for a year and a half and engaged in sexual "relationships" and the exchange of bodily fluids with three other inmates for an extended period of time. Jackson also acknowledged that he knew he was HIV positive since 1987. Jackson admitted that he provided extra food, commissary, narcotics, alcohol, and other items, such as unapproved undergarments to inmates who he had targeted for abuse.

99.     The FBI reported that Staff members were aware of the "gifts" dispensed by Jackson.

100.     On September 8, 2011, Jackson was federally indicted on two counts. *See United States v. Jackson*, Case No. 1:11-cr-20630-JAL (S.D. Fla.). The indictment charged:

**INDICTMENT:** *UNITED STATES v. JACK CHRIS JACKSON*

The Grand Jury charges that:

**GENERAL ALLEGATIONS**

At all times relevant to this Indictment:
1. The Miami Federal Correctional Institution (hereinafter "FCI") was a Federal prison located in Miami-Dade County, Florida, in the Southern District of Florida.
2. From June 1, 2011, through and including June 27, 2011, **JACK**

23

**CHRIS JACKSON** was an employee of FCI assigned to the Food Services Area (hereinafter "FSA").

3. M.C. was an inmate incarcerated at FCI.

## COUNT ONE
(Sexual Abuse of a Ward: 18 U.S.C. § 2243(b))

4. The allegations set forth in paragraphs One through Three of this Indictment are re-alleged and incorporated by reference into this Count as though fully set forth herein.

5. On or about June 27, 2011, in Miami-Dade County, in the Southern District of Florida, the defendant,

**JACK CHRIS JACKSON**,

While in FCI, a Federal prison, did knowingly engage in a sexual act, to wit, contact between the mouth and the penis and contact between the penis and anus, with another person, M.C., while M.C. was in official detention and under the custodial, supervisory, and disciplinary authority of **JACK CHRIS JACKSON**.

In violation of Title 18, United States Code, Section 2243(b)

## COUNT TWO
(False Statements: 18 U.S.C. § 1001(a)(2))

6. The allegations set forth in paragraphs One through Three of this Indictment are re-alleged and incorporated by reference into this Count as though fully set forth herein.

7. On or about July 1, 2011, in Miami-Dade County, in the Southern District of Florida, the defendant,

**JACK CHRIS JACKSON**

in a matter within the jurisdiction of the Federal Bureau of Investigation (hereinafter "FBI"), an agency of the executive branch of the Government of the United States, did knowingly and willfully make material false, fictitious, and fraudulent statements and representations, in that the defendant represented to a Special Agent of the FBI that the defendant had never engaged in sexual acts with any inmate at FCI, when in truth in fact, as the defendant then and there well knew, the defendant had engaged in sexual acts with an inmate at FCI.

In violation of Title 18, United States Code, Section 1001(a)(2).

*See United States v. Jackson*, Case No. 1:11-cr-20630-JAL, Doc. 3 (S.D. Fla. Sept. 8, 2011).

24

101.    On December 20, 2011, Jackson pleaded guilty to Count One of the Indictment, charging sexual abuse of a ward.

102.    Regarding Jackson's arrest and prosecution, Wilfredo A. Ferrer, *U.S. Attorney for the Southern District of Florida*, stated:[4]

> This correction officer [Jackson] abused his official position. This conduct is an intolerable breach of trust that not only endangers the safety of inmates but also compromises prison security. Our office will prosecute all official corruption cases to the fullest extent of the law.

103.    Thomas E. Perez, Assistant Attorney General for the Justice Department's Civil Rights Division, stated:[5]

> We will not tolerate corrections officers engaging in this behavior with institutionalized persons… The Justice Department will vigorously prosecute individuals who abuse their position and authority in this manner.

104.    At sentencing, the government prosecutors moved for an upward variance as Jackson did not advise PLAINTIFF of his HIV-positive status. With a Guideline range of 10 to 16 months, on March 19, 2012, Jackson was sentenced to a custodial term of a year and a day and a 5-year term of supervised release. On June 3, 2016, the court, against the wishes of the prosecutors, granted Jackson's request for early termination of his supervised release.

*  *  *

105.    PLAINTIFF suffered the devastating consequences of Jackson's abuse for another ten years in custody after Jackson pleaded guilty. PLAINTIFF was finally released from BOP custody pursuant to 18 U.S.C. § 3582(c)(1)(A) on January 23, 2023, long after Jackson was

---

[4]    *See U.S. Bureau of Prisons Employee Pleads Guilty in Florida to Sexual Abuse of a Ward*, Department of Justice: Southern District of Florida, published Dec. 20, 2011, available at, https://www.justice.gov/opa/pr/us-bureau-prisons-employee-pleads-guilty-florida-sexual-abuse-ward
[5]    *Id.*

released from his short custodial term and long after Jackson's supervised release was terminated in early 2016.

**E. The BOP and FCI Miami have a longstanding culture,
predating Jackson's abuse of PLAINTIFF, in which staff,
including Jackson, abused inmates.**

106.    It is well documented that incarcerated individuals are vulnerable to sexual assault. Indeed, it is in recognition of the vulnerabilities of inmates that the Bureau of Prisons has promulgated mandatory and binding policies requiring that all staff actively monitor for any evidence that employees are sexually assaulting inmates and immediately report any suspicion of misconduct.

107.    Yet, despite these policies and even before Jackson's multiple assaults against PLAINTIFF, FCI Miami had a long-standing culture of allowing officers to sexually assault, abuse, and rape inmates with impunity. Such is undeniable given the FBI's findings described above.

108.    DEFENDANT's employees, including but not limited to Warden Pastrana, Associate Warden Atkinson, Administrator Solomon, and other correctional and facility staff, either knew of or should have known of these repeated and flagrant abuses, as was confirmed during the referenced FBI interviews. Yet, in violation of mandatory Bureau of Prisons policy and in negligent and reckless disregard for inmates' rights and safety, staff, including supervisory staff, took no steps to keep PLAINTIFF safe from Jackson. As a result of that inaction, this culture of impunity and sexual violence was allowed to fester at FCI Miami —including permitting Jackson to assault and abuse PLAINTIFF and numerous other inmates, over a period of at least one and a half years.

26

109.    A study published by the U.S. Department of Justice Office of the Inspector General Evaluation and Inspections Division in Sept. 2009 (https://oig.justice.gov/reports/plus/e0904.pdf) revealed that between "fiscal years 2001 and 2008, BOP institutions reported a total of 1,585 allegations of staff sexual abuse (1,028) and sexual misconduct (557) with federal inmates. Allegations of staff sexual abuse and sexual misconduct were reported in all but 1 of the 93 BOP-managed prison sites." The study also found that "the general increase in allegations of staff criminal sexual abuse and sexual misconduct with inmates was greater than the increase in either the BOP's staffing level or inmate population over the same time period."

110.    The Federal prisons within the Southern District of Florida were no exception. FCI Miami and FDC Miami, according to the report, had 14 and 16 instances, respectively, between 2001-2008 of "reported allegations of staff sexual abuse of inmates." A 2022 Staff Report by the Senate's Permanent Subcommittee on Investigations[6] reveals that problems continue at the facilities located in the Southern District of Florida; indeed, in 2014, two cases were opened of staff-on-inmate abuse, and one remains pending at FCI Miami whereas in the same year at FDC Miami nine cases were opened, with two sustained and four closed administratively; in 2016, seven of the 11 claims filed at FDC Miami were sustained; in 2017, the only complaint at FCI Miami was sustained; in 2018, one complaint was sustained at both FCI and FDC Miami. On information and belief, only two correctional officials at these facilities have been prosecuted. *See United States*

---

[6]    *See* S. Comm. on Homeland Sec. and Gov't Aff., 117th Cong., Rep. on Sexual Abuse of Female Inmates in Fed. Prisons (2022), available at, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf

*v. Coleman*, 16-cr-20887 (S.D. Fla.) (FDC Miami) and the prosecution of PLAINTIFF's abuser, Jack Chris Jackson.

111.    Between 1999 and 2005, according to a 2007 FTCA lawsuit brought in the Southern District of Florida, three guards at FDC Miami sexually assaulted a female inmate, with Chief Judge Cecelia M. Altonaga remarking, "The undersigned finds S.R. was sexually abused on numerous occasions by the individual Defendants. The BOP and FDC-Miami did have notice of the illegal conduct taking place and were woefully deficient in addressing it and giving S.R. protection." *See S.R. v. United States*, 07-cv-10648, Doc. 254 at 17 (S.D. Fla. Nov. 5, 2008).

112.    Based on a 2018 letter from U.S. Sen. Ron Johnson to OIG, the culture at FCI Miami of ignoring sexual abuse continued after Jackson's 2011 arrest; an "arbitrator reportedly found that high ranking officers at FCI Miami—including the warden—participated in a 'grand cover-up' of sexual abuse and harassment. The arbitrator reportedly found that BOP failed to make a concerted effort to take preventative measure to avoid sexual harassment and retaliation."[7]

## V. DAMAGES

113.    Before Jackson's assaults, PLAINTIFF was on a positive path toward rehabilitation; he learned to cook and make meals for 1,100 inmates; he discovered he was an exceptional painter and pencil artist. He read over 300 books and studied world religions. But Jackson's serial predation of PLAINTIFF threw PLAINTIFF wildly off course, causing PLAINTIFF extraordinary physical and emotional injury.

---

[7]    *See* Letter from Sen. Ron Johnson, Chairman, S. Comm. On Homeland Sec. & Governmental Affairs, to Hon. Michael Horowitz, Inspector General for Office of the Inspector General, Department of Justice (Dec. 11, 2018), available at, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2018-12-11%20RHJ%20to%20DOJ%20OIG%20on%20Sexual%20Abuse.pdf

114. Often, during the period of the assaults, Jackson would tell PLAINTIFF that his family would be okay if PLAINTIFF was "good," which PLAINTIFF took as a threat unless he kept quiet and submitted to the assaults. This implicit threat weighed considerably on PLAINTIFF. Additionally, he lost weight during the course of the abuse and the post-rape period when PLAINTIFF was worried he may have contracted HIV from Jackson.

115. The assaults exacerbated PLAINTIFF's long-documented fragile mental state. The trauma he suffers is ongoing. PLAINTIFF feels "forever tarnished" from Jackson's sexual assaults. PLAINTIFF does not feel he will ever be able to live a normal life.

116. PLAINTIFF has also struggled to obtain mental health services and medication he believed he needed to help him with the trauma of assault and rape. After Jackson was prosecuted and while PLAINTIFF was still in custody, PLAINTIFF tried to obtain outside mental health services under the Prison Rape Elimination Act (PREA). This request — for reasons that remain unknown — was denied, and PLAINTIFF administratively appealed the BOP's decision not to provide him outside services, to no avail.

117. PLAINTIFF attempted suicide while in custody as a result of the abuse he suffered at Jackson's hands.

118. As a direct and proximate cause of DEFENDANT's negligence, PLAINTIFF suffered serious physical injury, resulting in substantial pain, humiliation, emotional harm, psychological trauma, pain and suffering, and damaged relationships with family and friends. As a direct and proximate cause of having been sexually assaulted while incarcerated — and therefore in a position of helplessness, lack of autonomy and agency, and isolation — PLAINTIFF has suffered ongoing injuries and damages that have persisted and likely are chronic. Additionally, PLAINTIFF's fear that he contracted HIV from being raped was pronounced. The symptoms

resulting from his preexisting schizoaffective disorder were greatly exacerbated by the assaults. The abuse that PLAINTIFF suffered continues to severely impact his mental and emotional health and his relationships.

119.    Additionally, at the inception of the investigation, and after PLAINTIFF was initially tested for HIV, a BOP psychiatrist told him he was HIV <u>positive</u>. He collapsed into tears and was inconsolable, believing he might die and not knowing how to inform his loved ones. However, some twenty minutes later, an FBI agent who had come to meet with him, seeing his distress, inquired about the reason for his present state. When told, he corrected that PLAINTIFF in fact was HIV <u>negative</u>. The psychiatrist apologized profusely.

120.    For the next two years, however, PLAINTIFF was tested intermittently for HIV, because, he was told, a positive reading could be delayed for that period. And so, he lived for two years knowing that, at any time, he could test positive.

## CLAIM FOR RELIEF

## NEGLIGENCE – FEDERAL TORT CLAIMS ACT

121.    PLAINTIFF hereby incorporates by reference all the foregoing paragraphs.

122.    Jackson's conduct toward PLAINTIFF while in custody constituted "sexual acts" as defined in 18 U.S.C. § 2246 and caused PLAINTIFF physical injury, resulting, *inter alia*, in PLAINTIFF suffering mental and emotional injury. *See* 28 U.S.C. § 1346(b)(2).

123.    The Federal Bureau of Prisons, the FCI Miami Management Team, Officers and the Prison Investigative Agencies owed a duty to PLAINTIFF while he was incarcerated at FCI Miami to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are safe, humane, cost efficient and appropriately secure," as mandated by the BOP.

124. The Federal Bureau of Prisons, FCI Miami Management Team, Officers, and the Prison Investigative Agencies breached their duties to PLAINTIFF by negligently supervising, managing, and retaining Officer Jackson during PLAINTIFF's incarceration at FCI Miami.

125. The Federal Bureau of Prisons, FCI Miami Management Team, Officers, and the Prison Investigative Agencies breached their duties to PLAINTIFF by providing Jackson with unrestricted and unsupervised one-on-one access to PLAINTIFF while incarcerated at FCI Miami despite knowledge of Officer Jackson's past sexual abuse and harassment of male inmates, including of PLAINTIFF.

126. The Federal Bureau of Prisons, FCI Miami Management Team, Officers, and the Prison Investigative Agencies breached their duties to PLAINTIFF by creating a system where victims of sexual abuse and harassment are punished for reporting the sexual misconduct of prison staff by transfer to more secure facilities, removal from educational and vocational programs, placement in special housing units, loss of early release rights, detrimental write-ups, and loss of work privileges.

127. The Federal Bureau of Prisons, FCI Miami Management Team and the Prison Investigative Agencies breached their duties to PLAINTIFF under PREA as follows:

- Section 115.11 – failing to enforce zero tolerance policy.
- Section 115.13 – failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact.
- Section 115.17 – hiring, promoting, and retaining officers who "may" have had improper sexual contact.
- Section 115.43 – punishing sex victims with involuntary segregated housing, loss of privileges and work permits.
- Section 115.61 – failing to report suspicion of sexual abuse.
- Section 115.67 – failing to protect inmates from retaliation after reporting abuse.
- Section 115.76 – failing to discipline staff for sexual misconduct.

128.     As a direct and proximate cause of the negligence outlined above, the FCI Miami Management Team and the Prison Investigative Agencies caused damage to PLAINTIFF including psychological trauma, emotional distress, depression, physical trauma, and pain and suffering.

129.     PLAINTIFF is entitled to damages from the United States of America under the Federal Tort Claims Act for the negligence of the FCI Miami Management Team and the Prison Investigative Agencies in an amount to be determined at trial.

**WHEREFORE**, PLAINTIFF prays as follows:

A. That the Court grant judgment in favor of PLAINTIFF on his claims for Negligence,

B. Award compensatory damages to PLAINTIFF against DEFENDANT in an amount to be determined at trial;

C. Grant PLAINTIFF a jury trial on all claims triable by jury;

E. Grant such other and further relief the Court deems just and proper.

Dated: January 3, 2024

Respectfully submitted,

Nicholas G. Kaizer
Richard W. Levitt
Levitt & Kaizer
40 Fulton Street, 17th Floor
New York, N.Y. 10038
Office: (212) 480-4000
nkaizer@landklaw.com
Fla. Bar No. 602736

William M. Norris, P.A.
134 Key Heights Dr.
Tavernier, FL 33070
Office: (305) 972-5732
wnorrislaw@aol.com
Fla. Bar No. 309990
